IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEANNIE JACKSON, | : | |
| | : | |
| Plaintiff | : | |
| | : | No. 4:12-cv-01719 |
| v. | : | |
| | : | (Judge Brann) |
| HOOPES TURF FARM, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

October 18, 2013

For the following reasons, the motion to dismiss of defendant Hoopes Turf Farm (Dec. 4, 2012, ECF No. 12) is denied in its entirety.

## I. The Complaint

On November 26, 2012, plaintiff Jeannie Jackson (hereinafter, "Jackson") filed an amended complaint (ECF No. 10) (hereinafter, "Am. Compl.") against her former employer, Hoopes Turf Farm (hereinafter, the "employer"), a trucking company for which Jackson was a driver (at least apparently – the complaint does not say), alleging counts of hostile environment sexual harassment under Title VII

of the Civil Rights Act of 1964 (hereinafter, "Title VII") (count I),[1] gender harassment under Title VII (count II), retaliation under Title VII (count III), and corresponding violations of the Pennsylvania Human Relations Act (hereinafter, "PHRA") (count IV).

In support of her claims, Jackson alleges summarily that, at least from December 2009 through Mid-July 2010,[2] she was "subjected to sexual harassment by [employer's] owner, Preston Hoopes [(hereinafter, "Hoopes")], on a consistent and daily basis." (Am. Compl. ¶¶ 16, 14-30). Specifically, Jackson avers that:

- On December 19, 2009, during a Christmas party at Hoopes's house, Hoopes "stared directly at [Jackson's] crotch" as he made an announcement to all of the attendees. (Am. Compl. ¶¶ 18-19).
- Once when Jackson contacted Hoopes for help with releasing a truck's "king pin," Hoopes came to her call "dressed in long johns and making wolf calls to [Jackson]." (Id. ¶¶ 20-21).

---

[1]The complaint originally asserted quid pro quo harassment as well, but this allegation has been withdrawn. (See Def.' s Opp'n Br., Dec. 17, 2012, ECF No. 14).

[2]Jackson provides no dates for the majority of incidents of sexual harassment she alleges. Based on the apparent chronological order of the incidents underlying the allegations in paragraphs 14-31 of her complaint, the Court presumes the incidents recounted therein occurred between December 2009 and mid-July 2010.

- Once when Jackson's car broke down at work, Hoopes asked if she would like to spend the night at his house since his wife was out of town. When Jackson demurred, Hoopes insisted that she drive his wife's car home. (Id. ¶¶ 22-23).
- On March 26, 2010, Hoopes telephoned Jackson, asking her to polish his truck the next day, normally her day off, a task for which he would pay her salary. She agreed. While Jackson polished, Hoopes asked her "personal questions about her sex life, [told] her stories about sex and [made] inappropriate sexual comments." (Id. ¶¶ 24-25).
- On April 11, 2010, Hoopes drove Jackson and Doug Parsall (hereinafter, "Parsall") to a meeting. When Jackson tried to get in the back seat of the vehicle, Hoopes insisted that she ride in the front seat with him, purportedly because he did not "want to look at Parsell's ugly mug." (Id. ¶¶ 26-27).
- At one point, Hoopes purchased an automatic dump truck, and told Jackson he had set it up just for her. When Jackson climbed in, Hoopes raised himself onto the driver's step and "placed his crotch against Jackson's hand." Even when Jackson moved her hand, "Hoopes remained very close to [Jackson] as he demonstrated" the truck's set-up. (Id. ¶¶ 28-30).

Jackson further alleges that Hoopes offered to let Jackson drive his personal truck

on numerous occasions, offered to take Jackson flying after he received his pilot's license, and suggested that Jackson get a motorcycle license so that she could attend Bike Week with him. (Id. ¶ 17). Finally, Jackson alleges that Hoopes left numerous voicemails for her in which he called Jackson "sleeping beauty," as well as voicemails in which he charged her with playing "hard to get." (Id. ¶ 39). Some of these voicemails may have come after mid-July, 2010 – it is not clear from Jackson's complaint.

In mid-July, 2010, Jackson told Hoopes that she was uncomfortable with his advances and asked him to put a stop to them. (Id. ¶ 31). As a result, Jackson alleges, Hoopes's began a campaign of retaliation against her that lasted until she was ultimately terminated by Hoopes in January, 2011. (Id. ¶ 32). Specifically, Jackson avers that:

- In early August, 2010, after Jackson notified Hoopes; employer's dispatcher, Robin Vetter (hereinafter, "Vetter"); employer's mechanic, Doug Eckert (hereinfater, "Eckert"); and another employee, that the truck she was driving for employer had broken down, Jackson waited for four hours before Eckert arrived to provide assistance. Hoopes subsequently informed Jackson that it was not employer's policy to pay a driver when her truck breaks down, and refused to pay Jackson for the four hours she waited for assistance. (Id. ¶¶

35-38)

- When Jackson was one of a number of employees completing an assignment for employer in the town of Ulster (the complaint does not reveal the state in which this particular Ulster is situated), she was denied lodging accommodations that other similarly situated male employees received. In particular, Brian Pakarsky and Pete Pollick were provided "sleeper cabs" for their 12-hour days and motels for each night, while Jackson was told (untruthfully) that employer was not providing employees lodging. Moreover, even though it had been agreed that drivers on the Ulster assignment would work three days followed by one day off, Jackson, alone amongst her colleagues, worked a 10 day stretch (without a motel room or time off). (Id. ¶¶ 40-44).

In concert with employer's dispatcher, Vetter, Hoopes also gave Jackson the runaround on a number of occasions.

- Once, when Jackson requested time off from work, Vetter informed her that she (Vetter) would have to talk to Hoopes before the request could be granted. Jackson never heard back from Vetter, and she (Jackson) duly reported to work. While Jackson inspected the truck she was to drive, Vetter approached and informed Jackson that she (Jackson) had the night off –

Vetter had forgotten previously to notify her. (Id. ¶ 45-47). Jackson was not compensated for the hour she wasted traveling to work on her day off. (Id. ¶ 52).

- On a second occasion in or around September, 2010, Jackson reported to work on a Sunday morning, only to be told by Vetter that her assignment had been cancelled – Vetter had again forgotten to notify Jackson. When Jackson submitted a time sheet seeking compensation for one hour of work on Sunday, Hoopes told Jackson to speak to Vetter.[3] (Id. ¶¶ 48-52).
- On a third occasion, when Jackson was laid off from December 1 through December 8, 2010, she learned that employer then had five trucks on assignment in Covington, Pennsylvania. Jackson called Hoopes, asking why she was not working when male employees with less seniority were. The next day, Vetter informed Jackson that she (Jackson) was scheduled to work between December 9 and December 12, 2010. Jackson apparently worked without incident between December 9 and December 11, but when she arrived on December 12, her truck was not at the shop. She drove to the job site, only to find her truck parked without a driver. When Jackson called Vetter for an explanation, Vetter told Jackson that the job had been cancelled

[3]At this time, Jackson also asked Hoopes for a letter of recommendation, which he did not provide. (Id. ¶ 52).

and that Hoopes had been responsible for telling Jackson. (Id. ¶ 53-60)

- On a fourth occasion, which occurred on December 15, 2010, when Jackson called Hoopes to inquire about her pay, Hoopes asked Jackson if she wanted to drive a roller for an assignment in Coudersport, PA. Jackson agreed and arrived at the address she had been given for the job, where she did not see any construction trucks. When Jackson called Hoopes, he explained that he had given her the wrong address. (Id. ¶¶ 61-63). Jackson did not work from December 16 through December 20, 2010. (Id. ¶ 64).

When she returned to work on December 21, 2010, Jackson thereafter underwent an ordeal with employer's equipment.

- Between December 21 and December 25, 2010, Jackson was provided a truck with a pump that kept freezing. She was instructed to use a hand torch to thaw the pump. On the 26th of December, she was informed that the pump was broken completely and there was no work for her. (Id. ¶¶ 65-67).
- Back at work on January 6, 2011, the pump on the truck Jackson operated repeatedly froze. Jackson was unable to reach anyone else on the telephone, so she called Hoopes and left him a message. Hoopes returned the message with his own message communicating that Jackson should not call him "if it was nothing important." Jackson returned his call, explaining the situation

with the pump and requesting a replacement truck. Hoopes refused a replacement, instead telling Jackson to do whatever it took to keep the truck working. (Id. ¶¶ 71-74).

- On January 9, 2011 Jackson was to drive a container to the Newark, NJ port. She was assigned a truck with known heater problems. When she reached Galeton, PA, her truck had not heated. Her side mirrors were freezing over, making it impossible for her to proceed safely. She stopped to clear the windows and mirrors. As she set the brakes, she saw flames coming from the axle of the chassis. Without a fire extinguisher, Jackson ultimately purchased gallons of water to put out the flames. When Jackson notified Hoopes of her misfortune, he falsely accused her of having the "spike" (a brake located on the steering column) on improperly. Hoopes terminated Jackson the next day, January 10, 2011. (Id. ¶¶ 75-82).[4]

On or about January 24, 2011, Jackson filed charges against employer with

[4]In addition to the specific events enumerated supra, Jackson alleges that Hoopes regularly would call her into work when he knew she had taken the day off for certain reasons, namely to go on a date or see friends, but not for other reasons, namely for appointments with physicians or for reasons related to her son. (Id. ¶¶ 33-34). Jackson also remembers calling to confirm an absence scheduled for January 3, 2011, when Jackson had an appointment with a physician. Despite notifying employer of her scheduled absence, Vetter contacted Jackson twice on January 3, 2011, asking her to work different jobs. Jackson did not receive calls for work on January 4 or 5, 2011. (Id. ¶¶ 68-70).

the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission (hereinafter, "EEOC"). (Id. ¶ 12). The EEOC issued a Notice of Right to Sue on May 30, 2012. (Id.). Jackson filed her original complaint with this Court on August 28, 2012 (ECF No. 1) and her amended complaint on November 26, 2012. Employer filed a motion to dismiss, primarily pursuant to Fed. R. Civ. P. 12(b)(6) on December 4, 2012. (ECF No. 12).

## II. Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 662. The goal behind the standard is to weed out those claims that do not present "enough" factual matter, assumed to be true, "to raise a reasonable expectation that discovery will reveal evidence" in support of the claims. Twombly, 550 U.S. at 556. Where a "plaintiff[] [fails to] nudge[] [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." Id. at 570.

As a matter of procedure, the United States Court of Appeals for the Third

Circuit has instructed that,

> after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [Iqbal, 556 U.S. at 678-79]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id. at 679].

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

## III. Discussion

### (a) Hostile Work Environment Sexual Harassment

Employer's motion to dismiss Jackson's hostile work environment sexual harassment claim for failure to state a claim is denied.

To state a claim for hostile work environment sexual harassment, Jackson must plausibly allege (1) that she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive;[5] (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same sex in Jackson's position; and (5) a basis for employer liability. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482

---

[5]"[S]exual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (internal quotations omitted).

(3d Cir. 1990); Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled on other grounds by Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53 (2006). Employer argues that Jackson's claim fails because she does not allege "severe or pervasive" harassment. (Def. Supp. Br., Dec. 4, 2012, ECF No. 13, at 10 (hereinafter, "Def. Supp. Br.")).

To determine whether harassment could reasonably be viewed as "severe or pervasive," the Court must look to the totality of the circumstances, including such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Unfortunately, circumstantial detail is generally lacking at the motion to dismiss stage, which makes it difficult to assess how a given complaint's allegations compare to conduct found "severe or pervasive" (or not) in previous cases. As the United States Court of Appeals for the First Circuit has noted,

> The highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior. Conduct that amounts to sexual harassment under one set of circumstances may, in a different context, equate with the sort of merely offensive behavior that lies beyond the purview of Title VII, and vice versa.

Billings v. Town of Grafton, 515 F.3d 39, 49 (1st Cir. 2008). Given the importance of circumstantial detail to the "severe or pervasive" inquiry, the Court is reluctant to dismiss a borderline case at the pleading stage.

Since further development of Jackson's allegations could put this case, roughly speaking, in the same league conduct-wise as Clegg v. Falcon Plastics, Inc., 174 F. App'x 18, 21-25 (3d Cir. 2006) ("Although we believe it is a close question, Clegg has presented sufficient evidence to establish a genuine issue of material fact as to whether, considering the post-reporting conduct in conjunction with the allegations of sexual harassment that pre-dated Clegg's complaint to management, Clegg was exposed to a hostile work environment."), and because Jackson alleges conduct – again, roughly speaking – in the same arena as that in Rorie v. United Parcel Serv., Inc., 151 F.3d 757, 761-62 (8th Cir. 1998) ("While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, we cannot say that a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law."), the Court is inclined to deny employer's motion to dismiss.

Employer's brief does nothing to shift the Court away from this inclination. Indeed, in what appears to be a troubling habit, employer argues for dismissal by

applying the law to a misrepresentation of Jackson's claim (See Def. Supp. Br., at 10-11), an exercise that is neither useful nor persuasive. When the analysis is rigged in employer's favor by ignoring a number of Jackson's allegations, employer wins easily. But when the Court considers the totality of Jackson's allegations and grants her every reasonable inference – i.e., performs the relevant inquiry – it must conclude that her allegations (of Hoopes's advances, sexually inappropriate banter, physical touching, and mistreatment of Jackson after she rebuffed his advances) satisfy the severe or pervasive standard for purposes of the pleadings.

**(b) Gender Discrimination**

Employer's argument for dismissal of Jackson's gender discrimination claim is the same as its argument for dismissal of her hostile work environment sexual harassment claim, and is therefore denied.

**(c) Retaliation**

Employer's motion to dismiss Jackson's retaliation claim is also denied.

To state a retaliation claim, Jackson must plausibly allege that: "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore

v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). Employer argues that Jackson's claim fails because her allegations show she cannot fulfill the causal connection requirement. (Def. Supp. Br., at 14-15). Specifically, employer asserts that Jackson's alleged protected activity – telling Hoopes in July 2010 that she was uncomfortable with his advances – and employer's alleged adverse action – which employer says is Jackson's termination in January, 2011 – are five months apart, which is not close enough to allow for an inference of causation.

But again, either intentionally or as a result of misapprehending the law, employer has misrepresented Jackson's allegations. To constitute an actionable "adverse employment action," the employer's conduct need be merely "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). This description includes Jackson's termination – which employer wrongly portrays as the single adverse employment action alleged by Jackson – but it also includes her allegations of a campaign of retaliation beginning at least as early as August 2010. Accordingly, employer's argument that a five month lapse between protected activity and adverse employment action forbids an inference of causation as a matter of law is purely academic. Since

employer has no other argument for dismissing Jackson's retaliation claim, the motion to dismiss is denied.

**(d) Pennsylvania Human Relations Act**

Employer moves for dismissal of Jackson's PHRA claim pursuant to Fed. R. Civ. P. 12(b)(1) (lack of subject-matter jurisdiction) on the ground that Jackson's filing with the Pennsylvania Human Rights Commission (hereinafter, "PHRC") was untimely, precluding her from proceeding in this Court. The motion to dismiss is denied.

Employer admits that the amended complaint asserts that Jackson's filing with the PHRC was timely. (Def. Reply Br., Dec. 27, 2012, ECF No. 15, at 3 (hereinafter, "Def. Rep. Br.")). For a number of reasons that may support dismissal at a later time, employer doubts her assertion is well-founded. (Def. Reply Br., at 2-5). But the Court assumes at this stage that Jackson's amended complaint was filed in compliance with Fed. R. Civ. P. 11, and further assumes the truth of her allegations. Accordingly, the Court will not dismiss Jackson's PHRA claim at this time.

## IV. Conclusion

For the foregoing reasons, the motion to dismiss of defendant Hoopes Turf Farm (Dec. 4, 2012, ECF No. 12) is denied in its entirety. An Order follows.

BY THE COURT:

s/ Matthew W. Brann
Matthew W. Brann
United States District Judge